So here are the Caribbean Ispat Limited v. United States Mr. Moran, when you're ready, let me say first, because we have multiple counsel arguing on one side, I will, in order to make sure that we don't end up prejudicing one of the counsel on the basis of our keeping another counsel up for too long, I will endeavor to try to make sure that we give you gentle reminders as to when you're beginning to run into one another's time. Very well, Mr. Moran. May it please the Court, I'd like to begin with what should be several undisputed propositions. First, even though there were 12 countries subject to anti-dumping petitions in the case below, the Caribbean Basin Economic Recovery Act required the Commission to conduct a separate injury determination with respect to Trinidad. This meant that the Commission was required to evaluate imports from Trinidad as if the petition had been filed against imports from Trinidad alone. Second, during the period of investigation the Commission examined, there were well over two dozen other countries than Trinidad selling wire rod in the market at the same time, many of these countries selling the same commodity grades, grades that everyone agrees sold primarily on the basis of price. Some of those import suppliers were part of the same investigation, the so-called other subject imports we refer to in our briefs. Some of those import suppliers were non-subject imports, not part of the investigation. Now it is undisputed that the volume of imports from these other suppliers were vastly larger in absolute terms. They increased at a greater rate over the period of investigation, gaining ten times the market share as imports from Trinidad. And many of these other suppliers were lower priced and undersold the domestic industry with greater frequency and at higher margins than imports from Trinidad. Now those facts are undisputed. Now, the law is equally clear. Under this Court's seminal decision in Gerald Metal's and reaffirmed in Taiwan's semiconductor, the by reason of standard required the commission, before it could conclude that imports from Trinidad alone were causing injury, to look at the effects of these other imports simultaneously in the market in greater volumes, increasing at greater rates and at higher margins. So, the adverse effects caused by these other imports. Let me just ask you about that. So, are you asserting that they were required to compare the Trinidad-Tobago to just the other subject imports or to the non-subject imports or to both? To both, Your Honor. And the absence of, I mean, even if they had compared it and done the separate run on the insufficient. Absolutely. The question is, are imports by themselves causing injury? And in order to conduct that analysis, there has to be an examination of other conditions in the market at the same time that are having an effect. The key lesson of Taiwan's semiconductor and Gerald Metal's was that a temporal connection between imports and injury isn't enough. The mere fact that imports happen to be in the market doesn't prove causation. There has to be some affirmative evidence. That's a fairly easy proposition, which I don't think anybody's going to disagree with. The temporal congruity won't do it. But once you start down the path of saying, well, you're going to have to prove independent causation, that's where I start to see subtleties in the argument. And I want to make sure I understand exactly what you're saying on that. The commission did, after all, say we think that Trinidad and Tobago itself caused some appreciable amount of the injury. So just on its face, that seems to be the kind of causation determination that you've been talking about. Now, obviously, you have something else in mind that you think Gerald Metal's requires by way of analysis beyond simply concluding that factual causation as opposed to merely temporal congruity is required. Absolutely, Your Honor. In this case, it's so far more compelling than either Gerald Metal's or Taiwan's semiconductor and here's why. In each of those cases, there was one other source of imports coming in at the same time as the unfairly traded imports at the same or lower price. And this court said, you need to take into account what would happen if the unfairly traded imports weren't there. Wouldn't purchasers simply switch to the fairly traded imports simultaneously in the market? It's a commodity product, after all. Why on earth would they switch to the higher priced domestic product when there was an available substitute at the same or lower price? In this case, there were dozens of other suppliers in the market at the same time selling a commodity product that sells exclusively on the basis of price according to petitioners. And why would the purchaser turn to the domestic product in that circumstance rather than turning to one of the other import suppliers? And you don't need to take my word for it because every one of our principal customers went to the commission, they testified to that basic economic common sense position that if Trinidad's out of this market, we're just going to go buy from somebody else because it's the same product. That seems to me, and I understand the passage from Gerald Metal that you're relying on, but it seems to me that that argument is a little bit like saying, sure, I caused the injury, but if I hadn't caused the injury, somebody else would have, and therefore, I'm not at fault. Now, if I were, just to take a perhaps somewhat silly example, if I were to walk around in a very dangerous part of town flashing a wad of cash and I got robbed, the robber, if he were caught, could hardly defend on the theory that, well, I didn't really cause the robbery or your loss because, boy, let me tell you, if I hadn't taken your money, five minutes later, somebody else would. Why is the form of causation that you're talking about here not pretty much similar to my example? Because we take issue with the premise that the commission, in fact, established a causal link between Trinidad and Tobago at all. Let's assume they did. Let's assume they did. Let's assume that we're satisfied that on the facts, as historical facts as they are, that there was evidence which is sufficient under the substantial evidence standard to establish that there was injury caused by Trinidad and Tobago, but nonetheless, that if Trinidad and Tobago, if you hypothetically removed them, then the domestic industry, things would have happened that would have resulted in the domestic industry being just as badly off. You say no cause, right? That's exactly right, and I think that is the lesson of Gerald Nettles. Well, but why isn't my example something that would give somebody pause about applying that analysis of causation? It's not the kind of analysis of causation you usually see in tort or criminal cases, right? But, Your Honor, this is all in the context of the Caribbean Basin Economic Recovery Act, where Congress had a specific goal in mind, and it was to encourage investment in the Caribbean region and to get them to a higher level of economic development, recognizing that they needed preferential market in order to ship their goods. And they recognized that in prior cases, imports from Caribbean countries were being vulnerable to injury findings precisely because they were being lumped in with all of these other imports, and they said, you need to look at them by themselves. And in this case, if imports from Trinidad are higher-priced than all the other or most of the other imports that the Commission itself concluded were causing injury in the same investigation, they attributed injury to all of these other lower-priced imports increasing at a greater rate in much higher volumes. They had an obligation at least to address whether the issue you're raising, whether they, by themselves, taking into account these other imports, were causing injury. They simply asserted that it was true. There's not a shred of analysis in this determination that even mentions either the vastly larger volume of subject imports or the non-subject imports. They simply don't mention it at all. And on appeal, they say, well, we're presumed to have looked at this. But that's not good enough. They mention it, I suppose, in at least the extent that they say, well, here are the percentages that Trinidad and Tobago made up. They were third on the list of subject importers, or whatever it was. I think third. Is that right? Second or third. Second or third. That's what it was, right. So that is an acknowledgment of the pertinence of the other importers, don't you think? I don't think so at all, because what's important is not the ordinal ranking, but the Trinidad versus the cumulated volume of those other imports. But they did have evidence of the comparison. And it seemed to me that looking at those numbers, Trinidad was not negligible. I agree. Trinidad was not negligible. Right. But at the same time, what the commission said was over the period of investigation, it was the increasing volume of imports from Trinidad that caused injury. Well, our market share increased less than one percentage point. The other unfairly traded imports, combined with subject, non-subject imports, increased ten times that. So how do you demonstrate the causal link between the .9 percent and the 9 percent without conducting some analysis? They just asserted it. And the same with pricing. Our imports were consistently higher priced. And this is why Chairman Okun's analysis is so important. And it's not because that's the only conclusion you can reach on this record, but she, interpreting Gerald Meadows, struggled with this issue of, how do I attribute injury to imports from Trinidad alone, in the face of these other non-subject and subject imports? She at least looked at the evidence, addressed it. We're not saying that that's the only conclusion that you can reach, but it's certainly the type of analysis that this Court, and the by reason of standard requires in the commission below, did not conduct that analysis. So is this a matter, I mean, in Gerald Meadows they said there's no substantial evidence to support it, and that was based on their reading of the by reason for, sort of a question of law, which leads you to a factual determination, right? Now are you saying that the non-subject and the subject imports should be combined, and you take that cumulative total? Absolutely. And again, it's not just a straight comparison, it's an analysis, looking at the effect of imports from Trinidad by themselves, versus these other factors that are in the market. If there had been a recession during the period of investigation, I'd be here telling you that the commission would have had an obligation, in some sense, to tease apart the effects of the recession. In Taiwan Semiconductor, there were three factors. Overcapacity in the worldwide market, the learning curve effects, underselling by the Korean imports at the same time that the subject imports were in the market. And the commission initially said, well, we still think Taiwan's good enough. We're going to go affirmative, and the CIT said, wait a minute, look at all these other factors in the market. It's true that Taiwan increased substantially. It's true that Taiwan is underselling. But how can you draw a causal link when there are these other adverse factors that, in this court's view, had a dominant effect? And that's our argument here. The other subject and non-subject imports combined had a dominant effect in the market that rendered immaterial the effect of Trinidad. And when you look at the confidential information that is in the joint appendix on volume trends and pricing trends, we don't think you can reach a contrary conclusion. So to make sure I understand your basic theory of causation here, and I understand that you have a lot of facts that bear on the analysis, but I want to make sure I understand what your theory of causation is that you start with before you get into any of the facts. Again, to take another example, if we have a claim made by the American automobile industry that they are being materially injured by the Japanese automobile industry, which is dumping, let's say, hypothetically, it would be open, in your view, if I understand it, to argue that it's true that the American automobile industry is being undersold by many, many Japanese cars. But if the Japanese were to withdraw from the market tomorrow, or historically had withdrawn at the beginning of the period of investigation, the Koreans would have ramped up enough to fill the market and the American industry would have been in just as bad a shape. No, that is not our argument, and here's the key difference. Well, I thought that's what you were saying Gerald Meadows stands for. Here's the key difference. You're saying, in essence, it's a but-for world, and my point is, no. And if I expressed it differently before, I want to clarify. Because in this, in your hypothetical, there's nothing to point to that's going on in the market simultaneously that's causing the injury that the domestic industry is feeling. It's clearly attributed to the unfair imports from Japan. If Korea had been in the market at much greater volumes, at lower prices at the same time, then yes, Gerald Meadows would have required the Commission to say, well, they're claiming it's Japan, but is it really Japan or is it Korea? It might be Japan, but they would at least have to analyze. They'd have to look at the conditions of competition in the market and determine whether those imports from Japan by themselves were responsible for material injury. Well, but again, to make sure I understand exactly what your theory is here, would you say, assume Korea had 15% of the market and had the capacity to increase to 50%, would it be under those circumstances, and assume further that Japan has 35% of the market, and it's clear that the Japanese imports are what is principally responsible for the adverse impact on the American economy, could you say in that situation, take the Japanese out and the Koreans would expand and that would be the end of the American economy? No, that is not the test. The key is, during the period of investigation, were there alternate suppliers in the market simultaneously selling the same good at the same or lower price? It has to be simultaneous. It can't be, well, in the future, all these imports might come in and so we're not going to put an order on today even though there's injury and causation because it's not going to have any effect. That's not our argument. But you're not relying in any way on the potential substitution of non-subject goods for the goods that are... I am not. I am counting exactly on the goods that were in the market, that were being sold in the same channels of distribution, in the same areas, at the same or lower prices, with greater margins of underselling and greater frequency of underselling and I'm saying the Commission, doesn't mean the Commission might not still conclude that imports from Trinidad alone are causing injury, but they have to confront those other facts and explain with a reasoned determination  they did not do that. Let me ask you, on that final point, so let's assume we conclude in the hypothetical about cars that Korea, during the same period of time, same goods, their imports were sufficient to also establish material injury for domestic producers. Where does that lead us? Does that mean Japan is off the hook? No, not at all. There can be simultaneous causes of injury. That's clear. The issue is whether the other causes render immaterial what the petitioners are claiming is the true cause. That's the test. If there's a material incremental injury, that's all you really have to prove, the Commission really has to find. From the subject. Well, they have to establish that there is injury and that it satisfies the more than de minimis or tangential contribution that you said from Gerald Meadows. If there is a finding that notwithstanding all of the injury caused by these other folks and other conditions, economic conditions and so forth, there was a material marginal injury caused by Trinidad and Tobago, that's fine, that's enough. It's not a material marginal. It has to be material injury. And the material injury, as this Court has interpreted it, is more than a minimal or tangential contribution. When I say marginal contribution, I think we're saying the same thing. We are not saying that there's some sort of per se test that because Trinidad's in the market with all these other countries, we get a free pass. But there has to be an analysis of the effect of these other imports and there has to be a reasoned determination supported by substantial evidence. And there's no dispute here that the Commission, in its determination, did not mention once the effect of these other imports. And everything in their briefs is post-hoc rationalization created first for the purposes of the appeal below and now for purposes of this appeal. Thank you very much. We'll save at least several minutes of your rebuttal time. We'll hear first from Mr. Englund. You're on behalf of the Commission, is that correct? I beg your pardon? On behalf of the Commission. May it please the Court. I think it's telling that no point here did opposing counsel at any time discuss what the Commission's grounds were for its affirmative injury determination passed to Trinidad and Tobago. There is no gap in the causal nexus that the Commission found between those imports and the material injuries suffered by the domestic industry. The Commission conducted a focus analysis on Trinidad and Tobago that was specific to Trinidad and Tobago in its circumstances. And on that basis, it made its affirmative injury determination. That's why this Court should uphold the Court below's finding that the record data provided more than an adequate basis for the Commission's decision here. The two factors that the Commission focused on in coming to its affirmative injury determination here, the first of which was related to volume. The Commission focused on, particularly on the years 2000 to 2001. There it is somewhere. I had it in front of me, and I couldn't find it earlier. There is somewhere a chart, a very simple chart that shows the respective percentages of the subject imports, the non-subject imports, and Trinidad and Tobago, and I couldn't find it. Can you point me to that? It's somewhere in the materials. Table C2A, which is on page... 2-1-2-1. And in that table, the Commission lays out... Yeah, that's not actually... That's not the simple chart. I was looking for something that has about six entries on it. I believe you may be referring to the brief of the Housing Council where they have a summary of that. Maybe so. Oh yeah, here it is. Turn right here. Page 37. Okay, go ahead. So, I'd like to point out, by the way, that one of our problems with that table is that the Commission considers underselling and volume on a quarterly, annual basis, and those tables are done in an average form, which is not the way that we conducted our analysis here. But if I may... Has everybody agreed? This table seems to suggest that at least over the pertinent time period, Trinidad and Tobago had about 12% of the total imports of the products in question. Does everybody agree with that? At least? Of the total imports approximately. Go ahead. The overall market share by 2001 of the overall U.S. market was around 5%, slightly more. But the standard... Again, turning back, if I may, to the volume and the significance that the Commission found there, the Commission found that import volumes particularly in the final year of the period of investigation, 2001, jumped by 23.5%. And that was the year in which the Commission also found that the material injuries suffered by the domestic industry were the most acute. If you look at the losses in that year, employment statistics, all the other metrics that the Commission looks to in determining whether the domestic industry suffered material injuries. So, in that year, volumes jumped for the subjects, for Trinidad's imports, in contrast to the non-subjects, which actually declined throughout this period. Then if you turn to price, which is the second significant major component of the Commission's finding here, the Commission found that Trinidad and Tobago undersold the domestic-like product by margins up to 11% and more than 70% of all price comparisons for all products, but particularly with respect to the highly price-sensitive commodity products, where Trinidad competed with domestic industry most directly, 85% of those comparisons were undersold. I'm sorry to interrupt, but my time is limited. What is the government's view of Gerald Metals? Why doesn't that compel a different result here? Gerald Metals requires that the Commission establish that the subject imports from more than a minimal or tangential cause of material injury that it found to the domestic industry. And we believe that is the correct standard, and in this case the Commission has more than met that standard in its analysis of Trinidad standing alone. And the discussion of Gerald was suggested earlier that it somehow raises that switch substitution argument that in fact the other subject imports could essentially replace the Trinidadian imports in this case with no effects that there is no material injury. But Gerald Metals does not create a new but-for-switch standard for causation. And the very significant distinction between that case and this case is that in that case, in Gerald Metals, there was actual present evidence that subject imports, that the non-subject imports in that case were in fact during that period displacing the subject imports. And by the way, I should note that I'm running into my account at the time. I will make sure that Ms. Cannon gets her full time. Thank you. But just to continue with that, the point there was, there was substantial evidence on the record that that case showed that in fact, the non-subject imports were displacing the domestic sorry, the other subject imports over the course of the proceeding. There's no evidence in this case of that, and that there was any displacement going on at all. And the fact of the matter is that I don't know how one would formulate this kind of standard into a present material injury standard. I mean, if anything, this kind of perspective analysis might have some prudence for a threat case, which isn't the case here. As far as we're concerned, the standard that Gerald Metals established for this additional increment of material injury that the commission needed to show before it could come to an affirmed determination as to another group of subject imports, the commission more than met here. I think it's also helpful then along those lines, if one considers the commission's impact analysis in this case. Again, we had this very significant price underselling, these very significant increases in Trinidadian volumes, and as you noted there was a very substantial presence in the market and the taken together remembering that this is a highly price-sensitive commodity market, the commission found and I'll just read to you from the commission's impact statement, in a commodity market for industrial-quality wire rod that is so highly price-sensitive, decisions by a supplier of this magnitude, as a reference to the size of Trinidad and Tobago, can have a significant impact on the market. And the conclusion that it did, in fact, in this case, is very well supported in the evidence. Is it your position, is it the commission's position, that in considering the causation question, non-subject imports should be taken into effect? Absolutely, and we did take those And why is it that the subject imports should not be taken into effect as well? Well, there's a distinction between taking into account the presence of other subject imports, which the commission clearly did, it arrived at a separate material interdetermination which discussed those other subject imports in detail. So there's no... I realize that, but in terms of the causation with respect to imports from Trinidad and Tobago... We think it's quite clear that when it comes to other dumped imports simultaneously present in the market, that Congress did not intend for the commission to treat one group of dumped imports as a mitigating factor in its material injury determination as to another group of dumped imports. And we think the SAA is quite clear that the commission is to examine in addition... It's a little hard to see what's special about the Caribbean countries if you're right about that, I'll put it that way. But there is a very important distinction under the Sabera provision, and the distinction is this. Sabera is an exception to mandatory accumulation, and what mandatory accumulation can mean is that you have a small country, for instance, let's say in this case, let's imagine a country whose volumes in fact drop throughout a period, and whose prices were not only higher than the other subject imports, but were higher than the domestic prices. Under mandatory accumulation, that country could be cumulated, its prices and volumes, with the other subject imports. And so it is not given an individualized determination as to its data. Sabera is an exception to that mandatory accumulation, and Trinidad benefited here from that exception. What the Sabera provision didn't do for Trinidad in this case was to when you basically lifted their data out separately, all that exercise did was to highlight the significant material injury caused by Trinidad's imports, because Trinidad was not one of these small suppliers selling at non-injurious prices in small volumes that Sabera was intended to protect. So it's simply not the case that unless we conduct a second, a comparative injury analysis in effect between Trinidad and Tobago and other subject imports, that they were deprived of the benefit of Sabera, that's simply not the case. So you're saying that causation here can be established, even though Trinidad and Tobago may not be the cause of the injury, because there are so many other dumped products, but all you have to look at is assume the non-subject imports are a very small part of the market, and you would simply look at the role of Trinidad and Tobago vis-a-vis the non-dumped, non-less-than-fair-value products. I must say, first of all, the standard is not whether they were the cause of material injury, it's whether they were a cause. I understand. So in this case, if the commission, looking at the substantial evidence on the record, had an adequate basis to find that Trinidad and Tobago, on its own merits, as was the case here, was a more than minimal or tangential cause of the material injury suffered by the domestic industry, that is enough. And that's independent of your legal argument about the non-consideration of the other subject importers? Are you folding that into their conclusion? Are they predicated, in their conclusion, on that legal step? I understand. We are of the position that the commission's determination stands on its own for, like, so to speak, the table, is separate and apart from this discussion as to the subject imports and how they are to be treated. As we discussed in our brief, there are really two issues as to the treatment of the other subjects. One is, the appellant's in their brief, but in one section they suggest that the commission is required to compare the relative impact of the accumulated subject imports and Trinidad's imports, and to determine whether the accumulated impact somehow washes out the Trinidadian impact. But the problem with that, and that's understood simply under the Severa provision, those two categories are intermingled. And particularly, this case is in fact a good example, where the underselling rate for the commission was in fact driven by the inclusion in their numbers of Trinidad. In other words, Trinidad's underselling rate was substantially higher than that of the other ones, considered on their own. So we're saying that you can't, how can those two overlapping categories pose an alternative to one another? The second issue relates to the commission's treatment of other subject imports in this investigation. What we are saying is, first of all, that the commission's determination here is more than adequate. And the commission, by having conducted a separate material injury determination as to the other subjects, clearly accounted for them. They were clearly aware of them. And you're saying they compared them. But the question of whether the commission is not required to conduct a separate analysis where it compares the impact of different groups of imports. There's no separate requirement, there's no requirement in the statute that the commission conduct a comparative injury analysis as the next step in its analysis. That's where I start to get, where the fog rolls in, quite frankly, for me. Because the whole purpose of a separate analysis would be to achieve at the end of the day a conclusion as to whether there was some significant independent, individual contribution to the injury by Trinidad. One way to do it is to say, well, what's the injury contributed by these other folks? Then you determine what the injury is that's been contributed by Trinidad. But you say that it's okay, in fact, what the commission did is to reach that ultimate conclusion. But they're not required to do it by looking at what happened somewhere else. I don't see how it's possible to make an accurate and fair assessment of the marginal injury, if you will, that is contributed by Trinidad, unless you're asking what's the injury contributed by the others, among other factors. Well, there are two points. The first is that in this case the commission's injury determination at Trinidad was quite specific. The book about Trinidad's focus, for instance, on the commodity products, the overwhelming majority of their products competed precisely with the domestic industry. The very high rates of underselling and the almost unique jump in Trinidad's volume increases in 2001. And it's important to recall that the material injury that the commission found here was that the domestic industry was suffering from a cost-price squeeze. Prices were suppressed from this underselling and its volumes dropped because domestic sales were being displaced by imports. Its unit cost rose. There was a very specific discussion of Trinidad and the Trinidadian imports were the commission's causal link. It was very specific that Trinidad's volumes, unlike the non-subjects, jumped in that period that it found the injury to be most acute. And the taking together with the price suppression, this went directly to the question as to whether Trinidad and Tobago, considered on its own merits, were a more than minimal or tangential contributor to the material injuries suffered by the domestic industry. And on these facts, the commission's analysis more than meets that standard. Okay. I'm sorry. Just to wrap it up. You are saying that there is no requirement on the commission to do any kind of comparison between Trinidad and Tobago and the other subject imports. Forget the non-subjects. Subject imports. Is our position that the statute does not require the commission to do a separate analysis where it compares the impact of Trinidad and Tobago to the other subjects? Well, I don't know what separate... I mean, to do a comparison. I don't know what we want to call it. A separate analysis or part that the commission's analysis of Trinidad and Tobago stands on its own and that the court is satisfied that the material evidence to which the commission has pointed its determination establishes that it has satisfied its minimal and tangential threshold. That fundamentally is the standard here. The question, the reason, this is one of the problems posed at the kind of comparison of different groups of subject imports is that different groups of subject imports are often comprised of different mixes of products. It becomes quite a complex analysis, and the fact is that there's no way to parse the causation in that way, and the statute recognizes that when it defines the significance of volume and price effects by reference to the domestic industry. The question is were the volumes of Trinidad and Tobago significant in comparison to the domestic production and sales? It doesn't say in comparison to subject import volumes and sales. And is that why you're saying Gerald Meadows wouldn't apply? I mean, is the distinction in Gerald Meadows because Gerald Meadows dealt with non-subject imports and a comparison there? That is a significant distinction between these two cases that the other factors that issue in Gerald Meadows were non-subject imports and the statute treats those differently. We have a mandatory analysis that we undertake as to subject imports. It's quite structured. There's no question that that information was taken into account in the commission's analysis. We had to do it. Well, we I'm sorry. Very well. Let's hear now from Ms. Cannon and we will save your full seven minutes. May it please the Court. Thank you, Your Honor for the time. I think the bottom line here is the ITC did undertake precisely the analysis required both by the statute under the Severe Provision as well as by Gerald Meadows and the causation analysis contemplated by the statute. All that the law requires including the Gerald Meadows and Taiwan Semiconductor cases is that the ITC not attribute the injury that it's looking at when it's asking whether imports from Trinidad caused harm to other sources. It did not do that here. They also require those cases that the ITC examine other factors in the market. Did the ITC examine the other subject imports? You bet. There's a huge detailed analysis of what was going on with respect to the accumulated imports in total and then the ITC and frankly I think if it had written one clause at the beginning of the Trinidad analysis we might not be here which said notwithstanding our conclusion that all the subject imports collectively caused injury, we also find that imports from Trinidad alone caused injury and here's why and then continued that is the analysis that's called for by the statute where it says is the injury by reason of those particular imports alone and then it went through a very detailed analysis of the volume the price and the impact from those Trinidad imports. What it didn't have to do was isolate the causes. What it didn't have to do as Mr. Moran admits is weigh the causes or find that there was only one cause. It couldn't find simultaneous causes and it did find both causes. Maybe one was bigger than the other but the other one was neither tangential nor minimal in the words of Gerald Meadows. If it's relevant in determining causation to examine non-subject imports, why is it not relevant to examine subject imports as well? My view is that the commission did examine subject imports as well. It absolutely did. Do you disagree with Mr. Engler's legal position that the two ought to be looked at differently for purposes of causation inquiry? No, I do agree that they are looked at differently and I think that's why the statement of administrative action cited by the lower court below says what it does. And the difference between the way the two are treated in your view is what should it be? The difference between the two is that the commission is statutorily obligated to look at subject imports and determine whether they are causing injury. There's a very detailed list of what it has to look at which it did do here. With respect to non-subject imports or any other cause, those fall within the statutory language that says you can also consider other factors and you should consider them and that's where you drift off into Gerald Mettles and how the commission is to analyze and determine that. So yes, they are addressed in separate parts of the statute. Does that make a difference in terms of how they ought to be addressed when you're involved in the process of trying to determine whether imports from country A have an impact and effectively the imports from countries that happen to be less than fair value imports and others that happen not to be less than fair value are having a for purposes of their effect on the American economy. Suppose that case. You wouldn't view them differently, would you? I wouldn't. It depends what you're asking, your honor. Would you view them differently in terms of whether they both might cause an injury to the industry and how you would look at that? Not necessarily, but you would view them differently in terms of analytically under the law how the commission has to analyze them because one is a subject import and therefore is cumulated and is looked at specifically for the injury. Right. Right. What justification would there be for a different view? The one point that I would say is that when you're looking at it, and maybe this goes to the little anecdotal example you gave earlier of a harm caused by robbers. When you're looking at unfairly traded imports, and you're saying does this collective presence of these imports and here's a little guy comes along and he's unfairly trading too. Does the presence of the other guys ameliorate or excuse his behavior and his injury? And the answer is no. Actually what happens from the vantage of the domestic industry that I represent is we are made more vulnerable because we have the presence of the big guys that are all beating up and taking our sales and now we have another unfair trader that's come along to do the same thing. And so that's why frankly it's worse. I mean you're looking at all of these imports that are collectively coming in, undercutting you, stealing your sales, depressing your prices. Isn't the legislation intended to not account for that? The legislation is intended to give Trinidad its own test, which it got here. Very clearly it got its own test. It wasn't cumulated for purposes of it got its own test. But the legislation also says when we draft this we are balancing their interests against the interests of American industries that are injured by these imports and we're not intending to just excuse them from any application of any dumping duties. We're intending that duties apply if, commission, you find that these imports alone cause injury. And that's what I'm saying this analysis did here. The commission when asked to say do these imports from Trinidad cause injury? What are they to look at other than what they did? The volume was large. They were the second or third largest. They surged into the market contrary to what Mr. Moran said. They were not lower surging. They were more quickly surging from 2000 to 2001 which was precisely the time that the industry was found to be most severely injured. They also undercut U.S. prices more often as a percentage of the collectively the subject imports did. So when you look at that, and they were targeted in the industrial quality rod which is where the U.S. producers were selling. So when you're looking at whether it was by reason there was a tangential more than a tangential or minimal contribution of injury by reason of those imports those are the precise factors that you would look at to say are these imports by themselves causing injury. So are you saying, because maybe I misunderstood Mr. Engler, but I thought he said that with respect to Trinidad and Tobago and the other subject imports, the commission was not required to do a comparison. Now maybe I misunderstood that. It sounds to me like you're saying that the commission in fact did a comparison between the two. Yes, and I think that's a very good question and the answer to the question frankly is how do you define comparison. I define comparison by saying, and I think what Gerald Metals and Taiwan Semiconductor stand for is that what the commission has to do is say is it by reason of these imports from Trinidad that's what we're talking about, and not by something else. It's because of them why, and go through a very specific factual analysis as to why it's by reason of them, which the commission did here, notwithstanding its separate finding of injury. So yes, I think the commission does have to do that, did do that, and his statement that they don't have to compare goes really to Mr. Moran's request that the commission start isolating and weighing clauses and saying, ah now let's see, as compared to these who were bigger than these would we somehow divine, which I have no idea how the commission would do, how much of the injury to the industry is by these big imports and how much is by these small ones. Comparison can morph into a kind of but-for test. Yes, and if you go to that, I completely agree with Mr. Engler, the commission is not required to go into that type of analysis, which is where I see the arguments by Mr. Moran trying to push the court. The commission is and did, it is required and did isolate the effects of imports, injury caused by imports from Trinidad and make sure it didn't attribute that injury caused by other subject imports to Trinidad, and that's what it's required to do. At the risk of covering already plowed ground, but to make sure that I understand which way the furrows run. You're saying that where the inquiry is into the marginal contribution of Trinidad to the injury, then you really do have to compare both the subject with the subject imports and the non-subject imports, but that's what the commission did, you say. They necessarily did that in order to reach the conclusion that Trinidad had this effect. Well, you necessarily have to examine them and examine their effects, the volume and price effects of the subject imports, which the commission did, and the volume effects of the non-subject imports, which were frankly just kind of tossed out as being stable, so those went off the radar screen, and then it said, okay, having looked at all this, now let's look at Trinidad, and that's the way it's set up. Gerald Mettle says there's no specific methodology that the commission has to do, so if you are hitting those statutory prerequisites, then in the end, and you have substantial evidence, which we do here, then in the end, the commission has satisfied the statute, and it doesn't have to get into a weighing or an isolating of constants. I think that's another step. Maybe compare is a bad verb that maybe I shouldn't be using. Maybe I should use the word consider in light of and must consider. And must consider and must examine, which is exactly what the court said in Taiwan Semiconductors, and under those specific requirements, the commission clearly did that. Okay. Thank you, Ms. Cannon. Thank you. Mr. Moran, why don't we give you three or four minutes if you need that much. All right. On this issue of comparison, it's interesting that you didn't hear anything this morning about the non-cumulation decision in the magnesium case involving Israel and China, which has a cumulation mandatory non-cumulation provision, which for all practical purposes is identical to the one here because it requires the commission to examine imports from Israel alone and determine whether those imports first are causing injury. This is a quote from the commission's determination. We do not find... Determination in this case, sorry. In Israel. In Israel. Yeah. Right. We do not find that the volume of Israel subject imports or any increase in that volume to be significant, particularly in comparison to their words. In comparison to the volume of subject imports of granular magnesium from China described earlier, and the volume of non-subject imports. So in comparison to both subject imports, in the same case, and non-subject imports. In polyvinyl alcohol, a case where the commission first looked at unfairly traded imports from three countries, China, Korea, and Japan, when affirmative, and then the next year the petitioners brought a new case against Taiwan. This is at page 29 of their decision. We also have an obligation to ensure that there is a reasonable indication of material injury that is by reason of the subject imports at issue in this investigation, citing Gerald Metals and Taiwan Semiconductor. Because of differences, in other words, because they did a comparison, because of differences in terms of the volume, price effects, and impact of subject imports from Taiwan, and the volume, price effects, and impact of the imports that were accumulated in the prior investigation, namely the unfairly traded imports from China, Korea, and Japan, quote, we are unable to conclude that there is a reasonable indication of material injury by reason of subject imports from Taiwan. All we are asking the commission to do in this case is precisely what it did in the Israeli case, precisely what it did in polyvinyl alcohol, and that is to conduct a consideration, if you will, or a comparison, to use the commission's terms, of what's going on in the market looking at other imports that are in the market selling at the same time in greater volumes at lower prices. The commission did not do that analysis here. Thank you. Let me, before we close, request a council to provide us with some materials, and I don't fault any of you for the appendix which contains segments of various documents because I think our rules lead one to conclude that anything more than segments sometimes are unwelcome. In fact, in this case, however, I would find it very helpful, and I think the rest of us would as well, to have full copies of the commission's determination along with the dissenting opinion of, I guess it was member Okun, is that correct? Chairman Okun, excuse me. And of the various staff recommendations that are exerted in this document. I say that with some trepidation. I don't want you all to have to provide a 10,000 page document, but perhaps, Mr. Moran, perhaps you and Mr. Engler could approach the lectern for just a moment and we can discuss logistics here. Are we talking about something that would be burdensome to reproduce? Are we talking about something that's only a few hundred pages? You're referring to the staff report on which the commission's determination was at least referred. That's not a tremendously big document. I mean, the entire record is... I'm just looking for the specific documents, and I think there were about four. There was the commission's... I guess we can be specific. I'll just go down the list of the ones that struck me as being potentially of interest to us. Ultimately we could get the record in this case, of course, and we will, but that takes weeks sometimes, believe it or not, to travel six blocks. It takes sometimes six weeks. The preliminary staff report that's listed as starting on page 658, the final report by the staff that's listed as beginning on 1811, the report released by the staff starting on 2118, the views of the commission 2325, and the descending views of Chairman Okun starting on 2404. Now, I don't know whether any of those are so voluminous that they would be burdensome to provide. Does it make sense for us to ask Mr. Engler, as the custodian of the commission's records, to perhaps be the person to undertake to provide those to us? Okay. I think we only need to have... Those will have the same designations as the other material we get, which is identifying what's confidential and what's not, in case that's necessary. That was the point of clarification. I was going to see whether all the documents you just identified, there's the APO confidential version, and then there's the public version. Would you like both? I think we would like the confidential. As long as the confidential material is marked, we can try to steer clear of revealing anything. Thank you very much. Thank you both. Council, the case is submitted.